**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **GEORGE D. METZ, II,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )   **CIVIL ACTION 22-CV-00062-TFM-MU** |
| | ) |
| **OFFICER MILNE and SGT. KELLEY,** | ) |
| | ) |
| *Defendants*. | ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

COME NOW, Defendants Clarence Milne (hereinafter "Milne") and Sergeant Michael Kelley (hereinafter "Sgt. Kelley") (collectively referred to herein as "Defendants"), by and through the undersigned counsel, and pursuant to Rule 56 of the Federal Rules of Civil Procedure, move this honorable Court for an order granting summary judgment as to all claims stated against the Defendants. As to these claims, there is no genuine issue of material fact and the Defendants are entitled to judgment as a matter of law. In support of their motion, the Defendants submit the following Memorandum of Law incorporated *infra*, as well as evidentiary materials incorporated into and attached contemporaneously herewith. For all the reasons set forth below, summary judgment is due to be granted in favor of the Defendants on the claims asserted by Plaintiff in his Complaint.

## MEMORANDUM OF LAW

The present matter is brought before this Court, not to address some legitimate violation of Constitutional rights or privileges, but for the purposes of generating YouTube ad revenue, ultimately wasting this Court's time and resources, along with that of the Defendants and the citizens of Mobile, Alabama. Plaintiff George D. Metz, II's  Complaint (hereinafter "Metz" or

"Plaintiff") brings a claim against Milne for an alleged violation of the Plaintiff's Fourth Amendment rights, and a claim against Sgt. Kelley for an alleged violation of his First Amendment rights. (Doc. 1 at ¶¶ 22, 25). Ultimately, Metz seeks punitive damages from the two Defendants, in their individual capacities, as a result of the alleged violations. (Ex. 1, Metz Dep., at 136-37). These claims stem from an incident that occurred at the front gate to the United States Coast Guard (hereinafter "USCG") Aviation Training Center (hereinafter "USCG facility" or "Base"), located on Tanner Williams Road in Mobile, Alabama. (Ex. 1 at 112-14; *see* Ex. 2; *see also* Ex. 3; *see also* Ex. 4).  The interaction leading to the alleged rights violations was not the result of some rogue or out of control police action, but the result of the Plaintiff's own purposefully directed and inflammatory conduct in interacting with USCG security personnel and filming onto a military installation. (*See* Ex. 2; *see also* Ex. 3; *see also* Ex. 4). As a result, the City of Mobile Police (hereinafter "MPD") were called to investigate a potential criminal trespass onto federal property and potential illegal filming of a designated military installation. (Ex. 3; Ex. 4). Upon arrival, and despite Plaintiff's best attempts to inflame the situation, MPD performed an investigation, obtained the Plaintiff's identification, and in order to deescalate the situation, requested that the Plaintiff continue his filming of the Base and USCG personnel from the opposite side of Tanner Williams Road. (*See* Ex. 2).

Ultimately, Metz's claims are due to be dismissed, as the Plaintiff's Constitutional rights were not violated and Defendants are entitled to qualified immunity. There is no doubt that, at least, the Defendants were performing discretionary functions at the time of the incident and their conduct did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known.

**UNDISPUTED FACTS**

**A.   Plaintiff's Content Creation/Activism**

Plaintiff George Metz is a full time YouTube content creator, and a self-professed activist and journalist, from Summerfield, Florida. (Ex. 1 at 8, 10-12). He is the current owner/operator of a YouTube channel entitled Rogue Nation. (Ex. 1 at 57-58). Through that YouTube channel (and its various related sister channels, websites, and social media) the Plaintiff publishes videos of him performing First Amendment "audits." (Ex. 1 at 57-68).  According to the Plaintiff, a First Amendment auditor "is someone that goes around to, again, test the knowledge and make sure that rights are being upheld and, you know, people are acting the way they should be and treating citizens how they should be treated." (Ex. 1 at 80). In short, and as summarized by Chief U.S. Magistrate Judge Stephen M. Doyle, the Plaintiff "film[s] various government buildings . . . in what appears to be multiple attempts to provoke potentially unlawful police responses."[1]

The Plaintiff has been performing these audits for the past four years, and has travelled all over the country to do so. (Ex. 1 at 11-12, 31-32; Ex. 5). In order to perform these audits the Plaintiff will travel to a location and spend several days there:

> A.     I try to get out as much as I can, but basically, I get out at least twice a month, maybe more. And when I say I get out, so what I'll do is I'll take -- especially recently, I'll take and go out for three or four days because it takes me, you know, a while to drive to Mobile or Jackson, Mississippi or -- I was up in Knoxville, Tennessee a couple weeks ago. So it takes me a day or so to drive up there. I'll get a hotel. The next day or two, I'll spend going around doing my videos, and then like the third or fourth day, I'll end up driving home.
>
> So I spend about, I'd say, eight to 10 days a month shooting video, and then I'll go home. I'll edit the video and spend the rest of the month releasing like a video a day, sometimes two videos a day.

---

[1] Recommendation of Magis. Judge at 1, <u>Metz v. Dodson</u>, No. 1:22-cv-303 (M.D. Ala. Feb. 22, 2023).

(Ex. 1 at 73). Once the Plaintiff has arrived at his location, he travels to as many government facilities as possible in order to film.

> Q.     What is your kind of normal course of practice when you arrive at these public facilities? . . . What is your normal routine when you get to a location?
>
> A.     I turn on my camera, and I walk and go through whatever areas are what would be known as accessible to the public. . . . So -- And, basically, I would show up and, you know, take some photos, some video of the facility.
>
> . . .
>
> So my whole premise is that if someone is going to try to exert power which they don't have or violate my rights, they're going to do it in a timely fashion, I guess you could say. So usually when I show up to a building or anything of that nature, if they're not hassling me within 10 minutes, then I'll usually move on to my next location.

(Ex. 1 at 36-37). During the course of these "audits," the Plaintiff interacts with law enforcement often:

> Q.     Okay. Since you've started your journalism and activism, how often would you say you actually have to interact with law enforcement on your calls in a given month?
>
> A.     I mean, if I put up 30 videos, 15 to 20 of them have officers in them.

(Ex. 1. at 89).

After conducting his "audit," the visit is determined by the Plaintiff, according to his own reasoning, to be either a "pass" or "fail."

> Q.     When you say "passes," you mean no confrontation or --
>
> A.     I mean people don't try to exercise power they don't have. They allow me to exercise my rights like they should, and it's just a pleasant experience.
>
> . . .

Q.      When you say that you considered it a fail if they called the police, explain that to me, if you don't mind, please.

A.      We consider it a fail because, you know, this is something that every American should know about filming in public. It's one of our most basic rights, the right to free press, and, unfortunately, because of our school system, no one was taught that the constitution and the founders wanted the right to free press to be specifically -- As a matter of fact, in the 1774 letter to the inhabitants of Quebec, the founders clarified the right to free press as the right to shame our public officials into doing what is noble. So I live by that intent, and, you know, that's what I do. So when I show up and I'm legally allowed to be where I am and I'm practicing my right and they try to enforce authority over me and then try to call the police to violate my rights, then that would be considered a fail.

(Ex. 1 at 43, 54-55).

After performing these audits, and making a subjective judgment on whether the audit was a "pass" or "fail," the Plaintiff then posts these videos online to his approximately 87,000 subscribers, from which he generates his primary source of income. (Ex. 1 at 10, 76, 137-38). In addition, and if the Plaintiff subjectively determines that an audit is a fail, he uses his ad income (along with additional donations) to file lawsuits. In fact, the Plaintiff advertises on at least one of his various websites that for every $600.00 he receives in donations, he will file a lawsuit. (Ex. 6). And ultimately, that is the Plaintiff's goal; to file as many lawsuits as possible:

Q:      Yeah. When it comes to filing these civil rights lawsuits, how do you feel that those bring about change?

A.      . . . Obviously, lawsuits that are settled come out of the tax payer's pocket, so my hope is that one day that enough people file lawsuits over petty ass -- petty stuff like illegal detainments, and we clog up the court systems, and the courts finally say, Hey, you've got to stop doing this stuff. You've got to have reasonable articulable suspicion to ask for I.D. and they actually start teaching these officer the actual law. How can you enforce the law when you don't know the law? That makes absolutely no sense. So part of the lawsuits is accountability.

5

. . .

> Q.   No, you're fine. You're fine. And so you are hopeful that people will join in this cause?
>
> A.   Absolutely, and raise the taxpayers' funds so much that they have to do something about it. Absolutely. When the taxes rise on my house 300 percent, you're gonna be damn sure I'm going to be looking into why. You know? Most Americans, they just don't care right now. So once it hits the pocketbook, that's when they'll care.

(Ex. 1 at 87-88, 91). The matter currently before this Court arises out of one of these audits, which was recorded, edited, and subsequently posted on the Plaintiff's YouTube page. (Ex. 2).[2]

**B.   October 13, 2020 Incident**

On October 13, 2020, at approximately 8:40 a.m., Plaintiff approached the USCG facility located at 8501 Tanner Williams Rd., Mobile, Alabama 36608. (Ex. 1 at 137; Ex. 2; Ex. 3; Ex. 4; Ex. 7). The Plaintiff drove his vehicle to the area and parked his van on the side of Foster Road (a dirt road that connects Tanner Williams Road and Zeigler Boulevard), near the entrance to the Base, and then approached the facility on foot. (Ex. 2 at 35:27-38:32; Ex. 8).[3] In order to approach the entrance to the Base, and its related guardhouse, Metz walked along the northbound side of Tanner Williams Road, along the grass and outside of the chain-linked fence of the Base. (Ex. 2 at 0:08-1:15). As he walked closer to the Base entrance, he was carrying a video camera and wearing a dark shirt with red writing, a hat, sunglasses, and a black facemask depicting a middle finger gesture made out of the words "fuck you." (Ex. 2 at 4:32; Ex. 3). Further, as he approached, the

---

[2] Defendants cite to Plaintiff's video in support of its Motion for Summary Judgment. However, Defendants note before the Court, and Plaintiff has admitted in deposition, that the video has been edited by the Plaintiff, as well as cut to remove "dead air." (Ex. 1 at 79-80, 153). Thus, the time stamps noted in the video are not an accurate representation of the length of time of the whole encounter. Nonetheless, Defendants do not object to the accuracy or authenticity of the portions of the video not edited by the Plaintiff. Defendants would reserve the right to supplement this motion, and to submit at trial, the full video should it be located and produced by Plaintiff, per agreement of the parties.

[3] Pursuant to Fed. R. Civ. P. Rule 201, Defendants request the Court to take judicial notice of the location of the United States Coast Guard Aviation Training Center and its relation to the surrounding roadways found in Defendants' Ex. 8.

Plaintiff filmed onto the base, highlighting both the Base sign, as well as vehicles entering and exiting the USCG facility. (Ex. 2 at 0:23-2:35).

After reaching the entrance to the Base, Metz stopped and filmed warning signs and notices located at the Base entrance, including warning notices which stated " U.S. Coast Guard Property, authorized personnel only entry into this area constitutes consent to search of personnel and the property under their control Title 18 U.S.C. § 1382," and "U.S. Government property NO TRESPASSING." *Id.* Once he had filmed the notice/warning signs, the Plaintiff walked across the paved entrance to the Base in order to take up a position next to a light pole on the north side of the entrance, immediately next to the Base security fence. After reaching his destination, the Plaintiff stopped and resumed filming the inside of the USCG facility. (Ex. 2 at 2:00-2:35).

Almost immediately, non-party USCG security guard Davis (hereinafter "Davis") approached Metz from the guardhouse and informed Metz that he "cannot film here" and to "get off of the property" because it was a "military installation."[4] (Ex. 2 at 2:55-3:10). About this time, and at 8:45 a.m., Davis places a call to emergency dispatch requesting the assistance of MPD. (Ex. 3; Ex. 7). Davis notes that Metz is "trying to film the base," that he was standing "right in front of the gate," and that he informed the Plaintiff to "leave a couple of times." *Id.* Immediately thereafter, another USCG security guard, non-party Johnathan Shelton (hereinafter "Shelton") arrives in a patrol vehicle, pushes Metz off of the paved portion of the Base entranceway and onto the grass next to the security fence, and again tells Metz to leave the property. Metz refuses, stating he is not on USCG property and insisting that he is instead on public property, and instructs Shelton to "call the fucking police, dipshit." (Ex. 2 at 3:53-5:45).[5]

---

[4] Though technically in the service of the Department of Homeland Security, the Coast Guard "shall be a military service and branch of the armed forces of the United States at all times." 14 U.S.C. § 101; *see also* 14. U.S.C. § 103.
[5] *See* U.S. v. McCoy 866 F.2d 826, 831 (6th Cir. 1989) ("'The use of these military lands for the limited public purposes for which they have been set aside,' Justice Stevens wrote, 'does not involve the bold defiance of authority

Additionally, at 9:00 a.m., USCG Petty Officer Bradley ("Bradley") makes a call to emergency dispatch. (Ex. 4; Ex. 7). Bradley informed emergency dispatch that Metz is "on Base" and "technically on our property" filming with a professional camera. He requested MPD assistance to remove the Plaintiff from "our particular property." (Ex. 4). He also noted that the Plaintiff was not allowed to video the Base from on "their property." *Id*. When asked where the Plaintiff was located, Bradley indicated that he was "right on our front gate on Tanner Williams. He's actually uh kinda gettin a little fighty with our security guards right now." *Id*. He further noted that the situation was "starting to escalate" and that MPD "might want to hurry up." *Id*. Bradley was asked whether Metz was on USCG property, to which he responded, "technically yes, he is on our side," that if he was on the other side of the road that they would not be able to do much, and that the Plaintiff was "standing on our grass uh cussing at our security guards." *Id*.

At approximately 9:01 a.m., MPD Officer Kimberly Kilburn (hereinafter "Kilburn") and Milne arrive on scene. (Ex. 2 at 5:48-6:00; Ex. 7). After his arrival, Milne began an investigation:[6]

> When I arrived on scene, I spoke with personnel working as security for the Coast Guard base. They informed me that an individual, [Metz], were trespassing on their property and that they had to remove you from their driveway to the position that you were in at that time, which was a grassy area up against a fence of the Coast Guard base, and they stated that you were still on their property.

(Ex. 9 at 8-9). In addition to speaking with the USCG security personnel, Milne testified:

> I observed [Metz] in the position I described you in standing against the fence with several signs clearly stating, No trespassing, U.S. Coast Guard base property.
>
> …
>
> Q.      Right. Did you have any evidence that I was on the base property?

---

that is foreseen by the structure of the statute and reflected in its legislative history.'") (citations omitted); *see also* Ex. 1 at 194-95.

[6] *See* Ex. 9 at 8-11, 14-17.

A.      Other than --

Q.      Besides his word

A.      Other than what I could see that day, that you were standing next to their fence that claimed -- stated that it was Coast Guard property, at that point in time, I had no other recourse or other resources to determine that.

(Ex. 9 at 9-11).

After observing the scene and speaking with USCG personnel, Kilburn and Milne approached Metz and asked him "what is going on," to which Metz explains that he was doing a "constitutionally protected activity" and that Shelton needed to be arrested for assaulting him "off Base." (Ex. 2 at 7:00-7:17). Milne explained that where Metz was standing is not public property and that it is instead USCG property. Upon hearing this, Metz immediately requests that a supervisor respond to the scene. (Ex. 2 at 7:17-7:40).

Officers Kilburn and Milne then request Metz to produce an ID, and state that they are performing an investigation related to a potential trespassing. (Ex. 2 at 7:18-7:44). Metz refuses to provide his ID (he states he does not have one) and again demands for Milne to request a supervisor. (Ex. 2 at 7:45-8:00). Milne states that he will provide a supervisor after Metz provides his information, and when Metz states that he is "not legally required to tell you who I am," Milne states that he will arrest him for trespassing if he does not provide his personal information. (Ex. 2 at 7:55-8:16). Metz then provides his first and last name and date of birth to Milne. (Ex. 2 at 8:16-8:39). Officer Milne asks Metz for either his social security number or his driver's license number, but Metz refuses, stating that asking for his social security number is a violation of the "1974 Privacy Act" and demands to speak to a supervisor. (Ex. 2 at 8:38-9:48). At some point, Metz provides his social security number to Milne, who calls the Plaintiff's information into MPD

to continue his investigation. (Ex. 2 at 9:40-12:30). Milne, via MPD dispatch, ran the information provided by the Plaintiff under one of the MPD's systems, but was unable to find any information identifying the Plaintiff. (Ex. 2 at 12:30-13:17). During this time, Kilburn asks the Plaintiff what his purpose was for the visit, to which he responds "I'm answering no more questions, supervisor. This guys just earned himself a lawsuit." (Ex. 2 at 9:40-10:03).  After being unable to locate Metz based on the information provided, Milne asked Metz if he had any other identification, to which Metz stated that he was not answering any other questions, that there was something wrong with the MPD system, and that the officers likely had six weeks of training and "didn't know what the fuck was going on." (Ex. 2 at 12:30-13:17). Of note, Metz testified that he did not believe the officers were lying to him when they noted they were having trouble finding him in their system. (Ex. 1 at 180).

After some time, Metz asks Kilburn if he is being detained, and she states that he is "for right now" until MPD is able to confirm his identity.[7] (Ex. 2 at 16:10-16:25). However, and despite this statement from Kilburn, Metz was never placed in cuffs, was never physically touched, was never escorted to a squad car, and was never arrested. (*See* Ex. 2). Metz testified that at this point, he had been on scene for approximately 20 minutes. (Ex. 1 at 181-82). Milne returns to the scene and switches places with Kilburn, who continues an investigation in an attempt to identify Metz, which is eventually successful. (Ex. 2 at 16:20-27:00). Thereafter, Sgt. Kelley arrived on the scene and briefly conferred with the officers and USCG personnel. (Ex. 2 at 29:29-32:00; Ex 10 (Kelley Dep.) at 7-8, 12, 15-16).  Sgt. Kelley tells Metz that USCG is stating that where he is standing is part of their property, and that if he wants to film, he needs to go across the street. (Ex. 2 at 32:00-33:43).  Milne then escorts Metz across the street, and Metz continues to film the officers, which

---

[7] Of note, Plaintiff testified that even if he would not have been detained at the time, he would have most likely stayed in order to speak to Sgt. Kelley. *See*  Ex. 1 at 183.

he describes as "fucking idiots." (Ex. 2 at 33:47-34:46).  After filming the police officers leave the entrance to the USCG facility, Metz states "looks like they didn't end up learning anything anyway so we're definitely going to have to take this to the next level here." (Ex. 2 at 34:47-35:15).

Metz then proceeds to his vehicle, which is parked on Foster Road near the Base. (Ex. 2 at 35:27-36:10; Ex. 8).  Upon Metz's arrival, three MPD patrol vehicles are idling behind his vehicle. (Ex. 2 at 36:01-36:20).  Metz asks Kilburn if there is an issue, and she tells Metz that they are running the tag attempting to obtain ownership information for the vehicle. Metz attempts to enter the vehicle and is then instructed to wait to get into the vehicle by Kilburn. (Ex. 2 at 36:20-37:20). At that time, Milne was running the tag on the vehicle, and it came back registered to a red vehicle which led Sgt. Kelley to believe it was a switched tag. (Ex 2 at 36:01-38:33; Ex. 10 at 13-15, 17-18). In order to determine whether the vehicle was properly registered to Metz, Sgt. Kelley asked Metz if it was his vehicle, to which Metz states that it is. *Id*. Kelley then approached the vehicle and observed the VIN number, to confirm the match. After determining that the vehicle was registered to Metz, Metz asks if he can get in his vehicle and leave, and Sgt. Kelley says "yes, sir," thus ending their encounter. *Id*.

As a result of the investigation, the Plaintiff was requested to move across Tanner Williams Road onto what Sgt. Kelley could easily determine by his experience and visual evidence to be a utility easement in order to continue his filming of the base. (*See* Ex. 1 at 199). The officers did not cuss at Metz, threaten him with force, touch him or his equipment, or place him in cuffs. (Ex. 1 at 185-87, 211-13; Ex. 2).  Metz has admitted that the area enclosed by the fence was a Coast Guard Base/military facility (and non-public forum) that he did not have permission to enter into or film on. (Ex. 1 at 141-43, 147-50, 152, 155-58, 167, 191, 194-95). Additionally, Metz has admitted he was not damaged at any point, and is only seeking punitive damages from the incident.

(Ex. 1 at 136). Ultimately, the Plaintiff was asked to continue his claimed First Amendment activities in another equally convenient location, and not on federal property; and was detained long enough for MPD and the Defendants to adequately identify him with the limited information Metz supplied. In sum, the Plaintiff's rights were not violated and the Defendants are entitled to qualified immunity.

## STANDARD OF REVIEW

Summary judgment under Federal Rule of Civil Procedure 56 is proper when the non-moving party fails to establish the existence of a genuine issue as to any material fact on an essential element of that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the party moving for summary judgment makes a *prima facie* showing that the non-movant does not have sufficient evidence to prove its case, the burden then shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial. *Id*. at 323–324. "To defeat a motion for summary judgment, the [non-movant] must raise 'significant probative evidence' that would be sufficient for a jury to find for that party. Summary judgment may be granted if the evidence [in the non-movant's favor] is 'merely colorable.'" *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998).

In evaluating a pending summary judgment motion, "Pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." *Tannenbaum v. U.S.,* 148 F.3d 1262, 1263 (11th Cir. 1998). "Yet even in the case of *pro se* litigants this leniency does not give a court license to serve as *de facto* counsel for a party or to rewrite an otherwise deficient pleading in order to sustain an action." *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (citations omitted).

## ANALYSIS

Based on Plaintiff's Complaint, Metz appears to claim violations of his First and Fourth Amendment rights based on the actions of the Defendants. However, the Defendants did not violate Metz's constitutional rights. At the very least, and *arguendo*, Defendants were acting as polices officers employed by the MPD on the date of the incident, and interacted with Metz as a direct result of emergency calls from USCG personnel. Therefore, Defendants are entitled to summary judgment as to Plaintiff's claims.

Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is a long held defense that provides "immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Fortyth*, 472 U.S. 511, 526 (1985). Qualified immunity protects government officials, in this case police officers, from civil liability "if they are performing discretionary functions" and "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To even be potentially eligible for summary judgment due to qualified immunity, the official must have been engaged in a 'discretionary function' when he performed the acts of which the plaintiff complains." *Holloman ex rel. Holloman v. Harland,* 370 F.3d 1252, 1263–64 (11th Cir. 2004). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Curry v. Hanks*, 2016 WL 777796, at *4 (S.D. Ala. 2016).

### A. Plaintiff's Section 1983 Fourth Amendment Claim Against Milne Is Due To Be Dismissed.

According to Plaintiff's Complaint, Metz argues that Milne's brief stop and investigation, specifically questioning the Plaintiff for I.D. information and requesting the Plaintiff's social

security number to confirm his identity, constituted illegal seizure in violation of the Fourth Amendment.[8] However, this claim is due to be dismissed as Milne did not violate the Plaintiff's constitutional rights and on the grounds that he had qualified immunity.

**I.      Discretionary Function.**

In determining whether a police officer was performing a discretionary function, it must be determined that the government employee was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Young v. Brady*, 793 F. App'x 905, 910 (11th Cir. 2019). It is not for the court to question whether the officer's actions were lawful or not. *See Harbert Int'l., Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). However, the initial issue for the court is whether "the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994).

It is beyond question that Milne was performing a discretionary function during his interaction with Metz. Milne was employed with the MPD on the date of the incident, was in uniform, and was dispatched along with Kilburn to respond to two separate emergency calls placed by USCG personnel. Upon his arrival, he interacted with the USCG personnel and Metz as a part of a routine police investigation into alleged criminal conduct on the part of Metz. Further, the Plaintiff's Complaint identifies Milne and Kilburn as "officers" upon their arrival at the scene.

---

[8] Defendants would note to the Court that the Plaintiff's Complaint is not unambiguous, in that his Count I states that he is making a claim as to violations of his Fourth and Fourteenth Amendment rights. As this Court is undoubtedly aware, when a specific provision of the Constitution is allegedly infringed, the Court must decide the claim in accordance with the terms of that Constitutional provision, rather than generic substantive due process. See *Graham v. Connor*, 490 U.S. 386, 394 (1989). Thus, given the language in Count I as a whole, it appears Metz is making a claim for Fourth Amendment violations, as opposed to Fourteenth Amendment violations, given his statement that "Officer Milne violated Metz's right to be free from unlawful seizure and search." In order to preserve judicial efficiency, Defendants will not address arguments as to any Fourteenth Amendment due process violation. However, if this Court determines that the Plaintiff is indeed making a Fourteenth Amendment violation claim, Defendants request a short extension for the purposes of supplementing this Motion in order to briefly address those issues.

(*See* Doc. 1). In sum, it is unquestionable that Milne was "performing a job related function," by responding to emergency calls regarding potential criminal activity, and investigating same, as a part of his employment as a police officer with MPD.

Given that there is overwhelming evidence that Milne was performing a discretionary function, and the Plaintiff has not (and cannot) present any evidence to the contrary, the burden thus shifts to the Plaintiff to demonstrate that Milne is not entitled to qualified immunity. To show that Milne is not entitled to qualified immunity, Metz must prove that Milne has "(1) committed a constitutional violation **and** (2) that the constitutional right the defendant violated was 'clearly established' at the time he did it." *Paullin v. City of Loxley*, 171 F. App'x. 773, 777 (11th Cir. 2006) (*emphasis added*). The Plaintiff must satisfy both elements of the two prong test in order for the government employee to lose qualified immunity. *See Barnett v. City of Florence*, 409 F. App'x. 266, 270 (11th Cir. 2010).

## II.    Milne Did Not Violate Plaintiff's Fourth Amendment Right.

In order for the Plaintiff to succeed in removing qualified immunity, he would have to demonstrate first that Milne committed a constitutional violation, of which he cannot. The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." However, an individual may be temporarily seized, and "'[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). "A seizure occurs whenever the police 'restrain[ ] the freedom of a person to walk away.'" *Jenkins v. Davis*, 2012 WL 2568165, at *4 (M.D. Ala. 2012). "Although not expressly authorized in *Terry, United States v. Brignoni-Ponce,* 422 U.S. 873, 881–882 (1975), was unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited

to the purpose of the stop." *Fla. v. Royer*, 460 U.S. 491, 498 (1983). "We consider the totality of the circumstances 'in light of the officer's own experience' and determine 'whether the officer can point to specific and articulable facts which, taken together with rational inferences from those facts' support an 'objectively reasonable suspicion that [the defendant] had engaged ... in a crime.'" *Young*, 793 F. App'x at 909. Interrogation or a request for identification by the police does not, *by itself*, constitute a Fourth Amendment seizure. *See I.N.S. v. Delgado,* 466 U.S. 210 (1984).

In addition to the forgoing, "[w]hen an official asserts qualified immunity for an alleged Fourth Amendment violation, the question is not whether the official had actual reasonable suspicion, but whether the official had 'arguable' reasonable suspicion. In other words, we consider whether an official had reasonable suspicion as 'an objective question viewed from the standpoint of a reasonable official at the scene' and based on the totality of the circumstances.'" *Young*, 793 F. App'x at 909 (11th Cir. 2019) (citations omitted).

In the present case, there can be no doubt that Milne had sufficient "reasonable suspicion of criminal activity," must less arguable reasonable suspicion, in order to warrant a constitutionally permissive investigative stop. At the time of the incident, Milne was investigating several potential criminal issues. According to 18 U.S.C. § 1382, "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . . [s]hall be fined under this title or imprisoned not more than six months, or both."[9] Additionally, 18 U.S.C. § 795 states that "[w]henever, in the interests of national defense, the President defines certain vital military and naval installations or equipment as requiring protection against the general dissemination of

---

[9] *See* Tokar v. Hearne, 699 F.2d 753, 756 (5th Cir. 1983) ("A military base commander has authority to exclude a civilian from his base even though the civilian, who is otherwise entitled to base privileges is a dependent of a serviceman.'" (citations omitted)).

information relative thereto, it shall be unlawful to make any photograph, sketch, picture, drawing, map, or graphical representation of such vital military and naval installations or equipment without first obtaining permission of the commanding officer of the military or naval post, camp, or station . . . ."[10] Furthermore, Ala. Code § 13A-7-4 states that a "person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."

At the time of the incident, Davis and Bradley both called for police to investigate potential criminal activity outside of the Base. Davis reported in his call that Metz was filming the Base, that he was on Base property, and that he did not leave after being requested. Bradley informed MPD via dispatch that Metz was on USCG property, that he was cussing at USCG security personnel, that he was improperly filming while on Base, and that the situation was escalating. On arrival, Milne testified that he observed the Plaintiff standing by the Base fence, which was clearly marked as U.S. Government property with "No Trespassing" signs on it. Furthermore, he observed the Plaintiff with camera equipment filming onto a federal military installation. In addition to emergency calls and his own observations, Milne spoke with at least two (and potentially three) USCG personnel prior to speaking with the Plaintiff. (*See* Ex. 2).

Although Metz would contend that the officers were not on scene long enough to conduct an extended investigation, Milne was not required to turn off his "common sense and ordinary human experience."[11] At the time, there was no need for Milne to conduct a more extended investigation into the location of property lines (as the Plaintiff would likely suggest). As noted in *McCoy*, 866 F. 2d at 830 (a case involving protestors handing out leaflets on a roadway next to,

---

[10] *See* Exec. Order No. 10104; *see also Tharp v. Alutiiq Pac., LLC*, 2018 WL 6628945, at *8 (D. Haw. 2018) ("Defendant also cites to Executive Orders 8381 and 10104 by President Franklin D. Roosevelt and President Harry S. Truman, respectively. Pursuant to Executive Orders 8381 and 10104, former Presidents have designated all federal military and naval installations, among other things, as "vital.").

[11] *See* U.S. v. Street, 472 F.3d 1298, 1307 (11th Cir. 2006) ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria.").

and drive leading into, the entrance of Wurtsmith Air Force Base), "[t]he existence of [the Base] does not depend on the strength of the government's legal title. Like the famous stone that Dr. Johnson kicked in refuting Bishop Berkeley, [the Base] exists. Anyone who looks at the base can see that it exists. It has existed, as the evidence showed, since World War II. It is undisputed that the government has enjoyed a possessory interest in the base for decades."[12]

In addition to the forgoing, Milne's investigative seizure, and specifically his request for I.D. and social security number of Metz, was constitutional as it was limited in duration and scope. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time." *Hayes v. Florida*, 470 U.S. 811, 816 (1985).[13] Ala. Code § 15-5-30 also give authority to police "of any incorporated city or town within the limits of the county . . . [to] stop any person abroad in a public place who he reasonably suspects is committing, has committed or is about to commit a felony or other public offence and may demand of him his name, address and an explanation of his actions."

As discussed *supra*, there is overwhelming evidence that Milne had at least arguable reasonable suspicion (if not actual reasonable suspicion) that Metz was trespassing on a federal

---

[12] Metz has also claimed that he was standing on a "public right of way." This argument too holds no water in relation to whether he was trespassing on military property. "But the main driveway of Wurtsmith Air Force Base was not built on land owned by the county. The county's right-of-way may have overlapped the driveway and the adjacent island, but a mere right-of-way, as the trial court noted, "is less than ownership...." The typical Michigan suburbanite owns the portion of his driveway that lies between the sidewalk and the street, even though that portion of the driveway is burdened by a local government's right-of-way. The right-of-way may cover the suburbanite's entire tree lawn, along with such of the driveway as lies within the tree lawn, but the right-of-way is less than ownership in fee, and the driveway belongs to the homeowner. As far as Wurtsmith Air Force Base is concerned, similarly, Judge Churchill said 'there isn't any question that the entire area up to at least the center of the road, if not beyond, is a part of the military base....' As a matter of real estate law, that proposition would seem unassailable." *United States v. McCoy*, 866 F.2d 826, 831 (6th Cir. 1989).

[13] *See* U.S. v. Hensley, 469 U.S. 221, 229 (1985) ("if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offence, that person may be able to be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information."); *see also* Hiibel v. Sixth Judicial Circuit, 542 U.S. 177, 189 (2004).

military installation and filming same. As such, and pursuant to the Alabama statute, Milne requested that Metz provide identification. While Plaintiff may argue that he was not required to provide his social security number information by statute, Ala. Code § 15-5-30 does not limit law enforcement to asking only name and address. Even, *arguendo*, the statute did limit the request to name and address, the Plaintiff waived any objection to producing same when he provided Milne with his name and date of birth, in lieu of his address. (Ex. 1 at 169).

Further, and after running the Plaintiff's information in at least one law enforcement identification system, and unable to come up with any identifying information, Milne requested more identifying information from the Plaintiff, and renewed his request for the Plaintiff's social security number.[14] In the end, and despite Metz's refusals to cooperate, Milne was able to establish the Plaintiff's identification using his social security number. He did so without placing Metz under arrest, without performing any physical search, without drawing a weapon, and without threats of violence. And once his identification was confirmed, Metz was free to leave as Milne and Kilburn repeatedly told the Plaintiff that he was not allowed to leave until his identification could be confirmed. The fact he remained at the scene to speak to Kelley was his own voluntary decision. Ultimately, the request for production of identifying information was the extent of the officer's actions. It must be restated that at no time was Metz placed in cuffs, searched, escorted to a squad car, arrested, or checked for weapons.

"What counts for qualified immunity purposes relating to [arguable reasonable suspicion] to arrest is the information known to the defendant officers or officials at the time of their conduct." *Windham v. City of Fairhope, Ala.*, 20 F. Supp. 3d 1323, 1335 (S.D. Ala. 2014). Here, Milne had the two separate calls to emergency dispatch regarding potential criminal activities occurring on a

---

[14] *See* Tuohy v. State, 776 So. 2d 896 (1999) (discussing a search of a criminal defendant who refused to provide ID and the seizure and use of a credit card to illicit same).

federal military installation. He spoke with several USCG security personnel regarding the Plaintiff's activities and his refusal to leave. And lastly, he observed the location of the Plaintiff in relation to the location of the clearly demarcated Base. Given the nature of the calls, the scene at the time of his arrival, and suspected criminal trespass by Metz, there is substantial evidence that Milne had sufficient "reasonable suspicion of criminal activity," must less arguable reasonable suspicion, in order to warrant a constitutionally permissive investigative stop and to sufficiently identify Metz.

### III.    Milne Did Not Violate A Clearly Established Right.

Assuming, *arguendo*, that this Court finds that Milne did in fact violate Metz's Fourth Amendment rights, Milne is still entitled to qualified immunity as his actions were objectively reasonable. In order for the Plaintiff to establish the second element of the two prong test, he must demonstrate that the right was clearly established in a "particularized sense." *See Brousseau v. Gaugen*, 543 U.S. 194, 199 (2004). When performing their analysis, courts will consider whether the officer's actions were "objectively reasonable regardless of the officer's underlying intent. *See Carter v. Butts Cnty., Ga.*, 821 F.3d 1310, 1320 (11th Cir. 2016).

In the present case, Milne's actions were objectively reasonable under the circumstances, and "an objectively reasonable officer in the same circumstances and possession the same knowledge as [Milne] could have believed that probable cause existed to [stop and I.D. Metz]." *Paullin*, 171 F. App'x at 777. Prior to arrival, Milne was alerted by several witnesses via emergency calls that Metz was trespassing on clearly marked federal property and that he was improperly filming onto the Base. Upon arrival, he observed the Base and observed the Plaintiff's location in relation to same. Having spoken to USCG security personnel and analyzing the physical properties of the scene himself, Milne then approached the Plaintiff and requested identification.

After initial refusals to cooperate, the Plaintiff turned over his name and date of birth to the officer, who was unable to locate the Plaintiff in his system. Seeking to identify the Plaintiff, Milne requested his social security number (since the Plaintiff refused to identify if he had any other forms of ID), to which Metz again refused. After further cajoling, Metz finally supplied his social security number to Milne, who was then able to identify Metz. Once his identification was established, Metz remained at the scene in order to speak with Kelley.

Given the forgoing facts, Milne had a legitimate interests in stopping Metz to investigate potential trespassing, and his request for identification (including social security number) in order to further investigate the situation, Metz's potentially criminal history, and for his own safety was objectively reasonable under the circumstances.[15] As such, Metz's claims against Milne should be dismissed, as Metz's Constitution rights were not violated and Milne is entitled to qualified immunity.

**B. Plaintiff's Section 1983 First Amendment Claim Against Kelley Is Due To Be Dismissed.**

Metz also brings a claim against Sgt. Kelley for violations of the Plaintiff's First Amendment rights.[16]  Like Milne, Plaintiff's claims against Sgt. Kelley are due to be dismissed, as the Plaintiff's rights were not violated and the claims against Sgt. Kelley are due to be dismissed based on his qualified immunity.

---

[15] *See* U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001); *see also* U.S. v. Villagrana-Flores, 467 F.3d 1269, 1277 (10th Cir. 2008).

[16] Defendants adopt and restate here the arguments made and law cited in Defendants' Footnote 8. Defendants renew their request that if this Court determines that the Plaintiff is indeed making a Fourteenth Amendment violation claim, a short extension is granted for the purposes of supplementing this Motion in order to briefly address those issues.

## I.        Discretionary Function.

For the sake of brevity and efficiency, Sgt. Kelley adopts and incorporates herein by reference the case law cited in Section (A)(I) set forth *supra*.

As with Milne, there can be no argument that Sgt. Kelley was performing a discretionary function at the time of his encounter with Metz. Sgt. Kelley was a Sergeant with the MPD on the date of the incident and was a responding supervisor, called to the scene at the request of the Plaintiff in his role as a supervisory officer. (*See* Ex. 2; Ex. 10 at 5). Given the fact Sgt. Kelley arrived at the scene in order to assist in the investigation, and arrived at the behest of Metz, there is sufficient evidence that he was performing a discretionary function at the time of this incident.

## II.       Kelley Did Not Violate Plaintiff's First Amendment Right.

Metz seemingly argues in his Complaint that Kelley violated his First Amendment "right to free press on public property" when he was asked to move across the street from the Base. However, the Plaintiff's First Amendment right was not violated as he had no right to film on a military installation (which the Plaintiff admits was a non-public forum). Indeed, the Defendants never asked Metz to stop filming or asked what the purpose of his filming was.  And, *arguendo*, Sgt. Kelley's demand for Metz to move across the street—to an area that was not USCG property—was, at most,  a content-neutral restriction on speech in a public forum that was reasonable in time, place, and manner.

To determine whether First Amendment rights have been violated, the Supreme Court has espoused a three-pronged analysis.  First, whether the speech is "protected by the First Amendment;" second, determining "the nature of the forum;" and third, whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 797 (1985). Additionally, the 11th

Circuit has clearly held on multiple occasions that "'[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.' In particular, we held that the plaintiffs there 'had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (citation omitted).

However, "it is decidedly not "obvious" that [*Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000)]'s 'general rule applies to the specific situation in question' here." *Crocker*, 995 F.3d at 1240–41. As an initial matter, filming into the Base is not an action protected by the First Amendment as it violates federal law.  Under 18 U.S.C. § 795, it is a federal crime to "make any photograph, sketch, picture, drawing, map or graphical representation" of any military, naval, or air-force installations and equipment without first obtaining permission. 18 U.S.C. § 795. Certainly, Metz's attempts to film the USCG military facility runs afoul this federal law, as he did not obtain permission from the base commander to film.[17] Furthermore, and as argued *supra*, the Plaintiff was also trespassing on federal property in violation of both federal and state law. Criminal conduct is not protected First Amendment activity. *See Louisiana ex rel. v. Nat'l Ass'n for the Advancement of Colored People*, 366 U.S. 293, 297 (1961) ("…criminal conduct [ ] cannot have shelter in the First Amendment.").[18]

---

[17] *See* Genovese v. Town of Southampton, 921 F. Supp. 2d 8 (E.D. NY 2013).

[18] *See* Redd v. City of Enter., 140 F.3d 1378, 1383–84 (11th Cir. 1998) ("Because we hold that the officers had arguable probable cause to arrest Anderson for disorderly conduct, we must hold that the officers are also entitled to qualified immunity from the plaintiffs' First Amendment claims. When a police officer has probable cause to believe that a person is committing a particular public offense, he is justified in arresting that person, even if the offender may be speaking at the time that he is arrested. *See United States v. Rubio, as modified,* 727 F.2d 786, 791 (9th Cir.1984) ( "We strongly disagree with any inference that criminal investigation is somehow prohibited when it interferes with ... First Amendment interests. When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play."); *see also Zurcher v. Stanford Daily,* 436 U.S. 547, 565, 98 S.Ct. 1970, 1981–82, 56 L.Ed.2d 525 (1978) (holding that Fourth Amendment requirements regarding search and seizure pursuant to warrant are sufficient to protect First Amendment interests that

Moreover, Plaintiff was not in a public forum when he was filming the Base at the time he was asked to relocate. It is undisputed that the Plaintiff was standing on and/or near the Base entrance driveway and next to the chain-linked fence of the USCG facility, which is federally owned property that is not open to the general public.[19] Even if Plaintiff's claims are true, that he was standing on a strip of grass next to the fence and turn lane leading into the Base, he was still on federal property which the USCG had the right to control and, by extension, limit the Plaintiff's First Amendment rights.[20]

Assuming Metz's filming of the USCG facility and related personnel was a protected activity under the First Amendment and he was standing in a "public forum," Sgt. Kelley did not violate his right by asking Metz to move across the street. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)

---

may be implicated in the search and **\*1384** seizure). Likewise, when an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit, even if the offender may be speaking at the time that he is arrested. We therefore conclude that the officers are entitled to qualified immunity from the plaintiffs' First Amendment claims, and that the district court erred in denying summary judgment to the defendants on those claims.").

[19] *See* United States v. Corrigan, 144 F.3d 763, 768 (11th Cir. 1998). ("There is no question, and the appellants do not dispute, that Fort Benning is a nonpublic forum that, like virtually all military installations, has never been regarded or designated as a place open to public speech activities. *See United States v. Albertini,* 472 U.S. 675, 686, 105 S.Ct. 2897, 2905, 86 L.Ed.2d 536 (1985) ("Military bases generally are not public fora...."); *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217, 47 L.Ed.2d 505 (1976) ("The notion that federal military reservations, like municipal **\*768** streets and parks, have traditionally served as a place for free public assembly and communication of thoughts by private citizens is ... historically and constitutionally false."); *M.N.C. of Hinesville, Inc. v. United States Dep't of Defense,* 791 F.2d 1466, 1473 (11th Cir.1986). As the Supreme Court has stated, it is "the business of a military installation ... to train soldiers, not to provide a public forum. . . . "[M]ilitary officials need not demonstrate actual harm before implementing a regulation restricting speech," and may act to forestall reasonably anticipated harm to morale or to the orderly functioning of the base.")

[20] *See* United States v. LaValley, 957 F.2d 1309, 1313 (6th Cir. 1992) ("In *United States v. McCoy,* 866 F.2d 826 (6th Cir.1989), we held that the grassy strip in question is part of WAFB. In *McCoy,* we addressed the issue as to whether the driveway at the main entrance to WAFB is part of the base for purposes of § 1382. In resolving that issue, we cited the district court's finding that "there isn't any question that the entire area up to at least the center of the road, if not beyond, is a part of the military base...." *Id.* at 831. The grassy strip on which the protestors were apprehended in the instant case was within the boundary that we already have determined to be part of the base. The mere fact that an easement had been granted to the state for the construction, maintenance and use of highway F–41 did not give the protestors the right, in bold defiance of military authority, to enter the base, after being previously barred.").

(citations omitted).  All activities protected by the First Amendment are subject to reasonable time, place and manner restrictions. *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972)).  "We have often approved restrictions of that kind [time, place and manner] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976).  Each of these requirements were satisfied by Milne and Sgt. Kelley.

First, Sgt. Kelley's demand for Metz to relocate and continue his activity across the street was content neutral.  In fact, Defendants never asked Metz what he was doing, what the subject of his filming was, what the purpose of his filming was, or any other question that would shed light on the content of Metz's First Amendment activity. (*See* Ex. 2). The Defendants' issue with Metz was not his activity, but his location—specifically that he was on the USCG facility without permission and trespassing onto federal, non-public property.  In short, Sgt. Kelley's "regulation" of Metz's "speech" was clearly content neutral.

Second, Sgt. Kelley's demand for Metz to move across the street served a significant governmental interest in keeping Metz from disrupting the flow of vehicular traffic going into the Base, and allowing USCG security guards to focus on their duties.[21]  Metz was standing directly next to the driveway leading to the guardhouse at the entryway of the USCG facility.  To address the commotion caused by Metz's presence and refusal to leave, additional USCG security and the MPD were called.  The additional USCG security guards and MPD officers who arrived on scene,

---

[21] *See* United States v. Corrigan, 144 F.3d 763, 768 (11th Cir. 1998) ("[M]ilitary officials need not demonstrate actual harm before implementing a regulation restricting speech," and may act to forestall reasonably anticipated harm to morale or to the orderly functioning of the base.")

in their respective vehicles, caused congestion in the driveway leading to the guardhouse. Further, Metz's presence was causing USCG's security guards to divert attention to him rather than focus on the vehicles approaching the guardhouse. In this way, Metz was preventing USCG's security guards from performing their duties. Relocating Metz across the street relieved the issues posed to the flow of traffic and permitted the USCG security guards to focus on their duties, both of which are significant governmental interests.

Finally, Sgt. Kelley's restrictions were narrowly tailored to serve these substantial governmental interests. Metz was not prohibited from speaking or filming at any time. He was merely asked to move approximately 30 feet away, just across the street, where he was permitted to continue speaking and filming.[22] Metz was still able to reach his intended audience (i.e., those who watch his videos posted online) from across the street. Thus, Sgt. Kelley's actions in requesting Metz to relocate were narrowly tailored.

### III.    Sgt. Kelley Did Not Violate A Clearly Established Right.

Lastly, and even if Sgt. Kelley violated Metz's First Amendment right, he cannot prove the second element of the two prong test. Although the Plaintiff has a right to film the activities of public officials in a public area, as noted above, there is no evidence that Plaintiff's right was clearly established in a "particularized sense." *See Brousseau v. Gaugen*, 543 U.S. 194, 199 (2004). "'[a]lthough the [plaintiffs there] ha[d] a right to videotape police activities, they ha[d] not shown that the Defendants' actions violated that right.' . . . First, there is the Supreme Court's oft-repeated instruction 'not to define clearly established law at a high level of generality.' With that negative injunction comes a positive command to ask 'whether the violative nature of particular conduct is

---

[22] *See* Blackston v. Alabama, 30 F.3d 117 (11th Cir. 1994).

clearly established.' And we must answer that question 'in light of the specific context of the case, not as a broad general proposition.'" *Crocker* 995 F.3d at 1241.

In this particular case, the Plaintiff's right has not been clearly established. As noted above, the Plaintiff was on federal property and attempting to film onto the Base. As discussed *infra*, it is clear that First Amendment activities can be limited on military installations, and the Plaintiff cannot present any evidence that he had permission, or any other right, to violate the bounds of federal property to video USCG personnel or the Base in general. In *Crocker*, the plaintiff brought a § 1983 action against an officer for violation of his First Amendment right as he was filming police activity while "spectating on the median of a major highway at [a] rapidly evolving scene of a fatal crash." *Id.* at 1241. Despite being in a public and traditional forum, the court found that the plaintiff could not prove that "[i]n that "specific situation," we don't think it would be obvious to every reasonable officer that *Smith* [*v. Cumming*] gave Crocker the right to take pictures of the accident's aftermath." *Id.*

The same is clear here. Sgt. Kelley was responding to an evolving investigation into potential criminal activity involving the Plaintiff filming onto a military installation, while standing on federally owned property. Given the information available, through his own observations, the observations of Milne and Kilburn, and the information provided to him from emergency dispatch and the USCG personnel at the scene, it is not "obvious" that "every reasonable officer" would determine that Metz had the right to conduct the alleged First Amendment activity in that location and manner. Given the forgoing, Metz's First Amendment claim against Sgt. Kelley is due to be dismissed, as the Plaintiff's constitutional rights were not violated, and Sgt. Kelley, who was acting within his discretionary function as an MPD officer, is entitled to qualified immunity.

## CONCLUSION

WHEREFORE, PREMISES CONSIDERED, Defendants Clarence Milne and Sergeant Michael Kelley move this Honorable Court to dismiss Plaintiff's claims in their entirety, as there are no genuine issues of material fact and the Defendants are entitled to summary judgment as a matter of law.

Respectfully submitted,

*/s/ K. Bryant Hitson*
RICARDO A. WOODS
CHRISTINE N. BURNS
K. BRYANT HITSON

*Attorneys for Defendants Clarence Milne and Michael Kelley*

**BURR & FORMAN LLP**
11 N. Water Street, Suite 22200
Mobile, Alabama 36606
(251) 345-8200
rwoods@burr.com
cburns@burr.com
kbhitson@burr.com

## Certificate of Service

I hereby certify that the foregoing has been served upon pro se Plaintiff herein via CM/ECF and/or via email, on the 31st day of March, 2023 as follows:

George D. Metz, II
4980 SE 140th Street
Summerfield, FL 34491
patriotdiscussions@gmail.com
*Pro Se Plaintiff*

*s/ K. Bryant Hitson*
OF COUNSEL