IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GEORGE METZ, II,                      )
                                      )
         Plaintiff,                   )
                                      )
v.                                    )        CIV. A. NO. 22-0062-MU
                                      )
OFFICER MILNE, *et al.,*              )
                                      )
         Defendants.                  )

## ORDER

On March 31, 2023, Defendants Clarence Milne and Sergeant Michael Kelley
filed a motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil
Procedure, as to all claims stated in Plaintiff's complaint. (Doc. 31). In support of their
motion, the Defendants submitted a Memorandum of Law and evidentiary materials.
(Docs. 31 and 32).  Plaintiff filed a brief in opposition to Defendants' motion for summary
judgment (Doc. 36), and Defendants filed a reply to Plaintiff's opposition (Doc. 37).
Upon consideration of the parties' briefs, all evidentiary materials submitted, and the
relevant law, the Court finds that Defendants' Motion for Summary Judgment is due to
be **GRANTED.**

## I. Introduction

Plaintiff's claims stem from an incident that occurred near the front gate to the
United States Coast Guard Aviation Training Center ("USCG facility" or "Base"), located
on Tanner Williams Road in Mobile, Alabama. (Ex. 1 at 112-14; *see* Ex. 2, 3, 4). Plaintiff
George Metz, a full time YouTube content creator from Summerfield, Florida, is the
current owner/operator of a YouTube channel called Rogue Nation. (Ex. 1 at 8, 10-12,

57-58). Through that YouTube channel, Plaintiff publishes videos of himself performing what he terms as First Amendment "audits." (Ex. 1 at 57-68). According to Plaintiff, a First Amendment auditor "is someone that goes around to, again, test the knowledge and make sure that rights are being upheld and, you know, people are acting the way they should be and treating citizens how they should be treated." (Ex. 1 at 80). As summarized by Chief U.S. Magistrate Judge Stephen M. Doyle, Plaintiff "film[s] various government buildings . . . in what appears to be multiple attempts to provoke potentially unlawful police responses." *See Metz v. Dodson,* No. 1:22-cv-303 (M.D. Ala. Feb. 22, 2023).

The case currently before this Court arises out of one of these audits, which was recorded, edited, and then posted on Plaintiff's YouTube page. (Ex. 2). As described more fully herein, on October 13, 2020, Defendants were called to the USCG facility to investigate a report of a trespassing on USCG property and, upon arrival, encountered Plaintiff. Based upon this encounter, Plaintiff has brought a claim against Defendant Milne for an alleged violation of his Fourth Amendment rights and a claim against Defendant Kelley for an alleged violation of his First Amendment rights. (Doc. 1 at ¶¶ 22, 25). Plaintiff seeks damages from these Defendants, in their individual capacities, as a result of the alleged violations. (Ex. 1 at 136-37).

Defendants contend that they are entitled to summary judgment because Plaintiff's Constitutional rights were not violated and because they are entitled to qualified immunity. (Doc. 31 at p. 2). Defendants aver that the evidence is undisputed that they were performing discretionary functions at the time of the incident and that their conduct did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known. (*Id.*).

## II. <u>Undisputed Facts</u>

On October 13, 2020, at approximately 8:40 a.m., Plaintiff approached the USCG facility located at 8501 Tanner Williams Rd., Mobile, Alabama 36608. (Ex. 1 at 137; Ex. 2; Ex. 3; Ex. 4; Ex. 7). The Plaintiff drove to the area and parked his van on the side of Foster Road, near the entrance to the USCG facility, and then approached the facility on foot. (Ex. 2 at 35:27-38:32; Ex. 8). Plaintiff approached the entrance to the facility, and its related guardhouse, by walking along the grass outside of the fence surrounding the facility on the side of Tanner Williams Road on which the facility is located. (Ex. 2 at 0:08-1:15). As he walked closer to the entrance, carrying a video camera and wearing a dark shirt with red writing, a hat, sunglasses, and a black facemask depicting a middle finger gesture made of the words "fuck you," Plaintiff filmed onto the USCG facility, highlighting both the USCG facility sign, as well as vehicles entering and exiting the Base. (Ex. 2 at 0:23-2:35; Ex. 2 at 4:32; Ex. 3).

After reaching the entrance to the Base, Plaintiff stopped and filmed warning signs and notices located at the Base entrance, including warning notices which stated "U.S. Coast Guard Property, authorized personnel only, entry into this area constitutes consent to search of personnel and the property under their control Title 18 U.S.C. § 1382," and "U.S. Government property NO TRESPASSING." *Id*. After he filmed the notice/warning signs, Plaintiff walked across the paved entrance to the facility and took up a position next to a light pole on the other side of the entrance, immediately next to the USCG facility security fence. He then resumed filming the inside of the USCG facility. (Ex. 2 at 2:00-2:35).

Almost immediately, non-party USCG security guard Davis approached Plaintiff from the guardhouse and informed him that he "cannot film here" and to "get off of the property" because it is a "military installation."[1] (Ex. 2 at 2:55-3:10). At 8:45 a.m., Davis placed a call to emergency dispatch requesting the assistance of the Mobile Police Department ("MPD"). (Ex. 3; Ex. 7). Davis reported that Plaintiff was "trying to film the base," that he was standing "right in front of the gate," and that he had informed Plaintiff to "leave a couple of times." *Id*. Immediately thereafter, another USCG security guard, non-party Johnathan Shelton arrived in a patrol vehicle, pushed Metz off the paved portion of the Base entranceway and onto the grass next to the security fence, and again told him to leave the property. Plaintiff refused, stating he was not on USCG property but rather public property, and instructed Shelton to "call the fucking police, dipshit." (Ex. 2 at 3:53-5:45).

Additionally, at 9:00 a.m., USCG Petty Officer Bradley made a call to emergency dispatch. (Ex. 4; Ex. 7). Bradley informed emergency dispatch that Plaintiff was "on Base" and "technically on our property" filming with a professional camera, and he also requested MPD assistance to remove Plaintiff from "our particular property." (Ex. 4). He also noted that Plaintiff was not allowed to video the Base from on "their property." *Id*. When asked where Plaintiff was located, Bradley indicated that he was "right on our front gate on Tanner Williams. He's actually uh kinda gettin a little fighty with our security guards right now." *Id*. He further noted that the situation was "starting to escalate" and that MPD "might want to hurry up." *Id*. Bradley was asked whether

---

[1] Though technically in the service of the Department of Homeland Security, the Coast Guard "shall be a military service and branch of the armed forces of the United States at all times." 14 U.S.C. § 101; *see also* 14 U.S.C. § 103.

Plaintiff was on USCG property, to which he responded, "technically yes, he is on our side," that if he was on the other side of the road that they would not be able to do much, and that Plaintiff was "standing on our grass uh cussing at our security guards." *Id*.

At approximately 9:01 a.m., MPD Officers Kimberly Kilburn and Milne arrive on scene. (Ex. 2 at 5:48-6:00; Ex. 7).  After his arrival, Milne began an investigation:

> When I arrived on scene, I spoke with personnel working as security for the Coast Guard base. They informed me that an individual, you, were trespassing on their property and that they had to remove you from their driveway to the position that you were in at that time, which was a grassy area up against a fence of the Coast Guard base, and they stated that you were still on their property.

(Ex. 9 at 8-9).[2] In addition to speaking with the USCG security personnel, Milne testified that he also took the following investigative steps:

> I observed you in the position I described you in standing against the fence with several signs clearly stating, No trespassing, U.S. Coast Guard base property.
>
> …
>
> Q.      Right. Did you have any evidence that I was on the base property?
>
> A.      Other than --
>
> Q.      Besides his word
>
> A.      Other than what I could see that day, that you were standing next to their fence that claimed -- stated that it was Coast Guard property, at that point in time, I had no other recourse or other resources to determine that.

(*Id.* at 9-11).

---

[2] Because Plaintiff, who is proceeding *pro se*, was conducting the deposition, Milne's references to "you" were directed at and referred to Plaintiff.

After observing the scene and speaking with USCG personnel, Kilburn and Milne approached Plaintiff and asked him "what is going on," to which he explained that he was doing a "constitutionally protected activity" and that Shelton needed to be arrested for assaulting him "off Base." (Ex. 2 at 7:00-7:17). Milne explained that where Plaintiff was standing is not public property and that it is instead USCG property. Plaintiff immediately requested that a supervisor respond to the scene. (Ex. 2 at 7:17-7:40).

Officers Kilburn and Milne then requested Plaintiff to produce an ID and stated that they were performing an investigation related to a potential trespassing. (Ex. 2 at 7:18-7:44). Plaintiff refused to provide an ID, stating that he does not have one, and again demanded that Milne request a supervisor. (Ex. 2 at 7:45-8:00). Milne responded that he would provide a supervisor after Plaintiff provided his information, and when Plaintiff stated that he was "not legally required to tell you who I am," Milne stated that he would arrest him for trespassing if he did not provide his personal information. (Ex. 2 at 7:55-8:16). Plaintiff provided his first and last name and date of birth to Milne. (Ex. 2 at 8:16-8:39). Milne then asked Plaintiff for either his social security number or his driver's license number, but Plaintiff refused to provide either, stating that asking for his social security number was a violation of the "1974 Privacy Act" and again demanded to speak to a supervisor. (Ex. 2 at 8:38-9:48). Eventually, Plaintiff provided his social security number to Milne, who called Plaintiff's information into MPD to continue his investigation. (Ex. 2 at 9:40-12:30). Milne, through MPD dispatch, ran the information provided by Plaintiff under one of the MPD's systems, but was unable to find any information identifying Plaintiff. (Ex. 2 at 12:30-13:17). During this time, Kilburn asked Plaintiff what his purpose was for the visit, to which he responded "I'm answering no

more questions. Supervisor. This guy's just earned himself a lawsuit." (Ex. 2 at 9:40-10:03). After being unable to identify Plaintiff based on the information provided, Milne asked him if he had any other identification, to which Plaintiff responded that he was not answering any other questions, that there was something wrong with the MPD system, and that the officers likely had six weeks of training and "didn't know what the fuck was going on." (Ex. 2 at 12:30-13:17).

After some time, Plaintiff asked Kilburn if he was being detained, and she stated that he was "for right now" until MPD was able to confirm his identity. (Ex. 2 at 16:10-16:25). However, Plaintiff was never placed in cuffs, was never physically touched, was never escorted to a squad car, and was never arrested. (*See* Ex. 2). Plaintiff testified that, at this point, he had been on scene for approximately 20 minutes and further testified that, even if he had not been detained, he would most likely have stayed anyway to speak to Sgt. Kelley. (Ex. 1 at 181-83). Kilburn continued an investigation to attempt to identify Plaintiff, which was eventually successful. (Ex. 2 at 16:20-27:00).

Thereafter, Sgt. Kelley arrived on the scene and, after briefly conferring with the officers and USCG personnel, told Plaintiff that the USCG was stating that where he was standing is part of their property and that, if he wanted to film, he needed to go across the street. (Ex. 2 at 29:29-33:42; Ex 10 at 7-8, 12, 15-16). Milne then accompanied Plaintiff as he willingly crossed the street, while continuing to film the officers, who he described as "fucking idiots." (Ex. 2 at 33:47-34:46). After filming the police officers leaving the entrance to the USCG facility, Plaintiff stated "looks like they didn't end up learning anything anyway so we're definitely going to have to take this to the next level here." (Ex. 2 at 34:47-35:15).

Plaintiff then proceeded to his vehicle, which was parked on Foster Road near the Base, and found three MPD patrol vehicles idling behind his vehicle. (Ex. 2 at 35:27-36:20; Ex. 8). Plaintiff asked Kilburn if there was an issue, and she told him that they were running the tag attempting to obtain ownership information for the vehicle. Plaintiff attempted to enter the vehicle and was instructed to wait to get into the vehicle by Kilburn. (Ex. 2 at 36:20-37:20). At that time, Milne was running the tag on the vehicle, and it came back registered to a red vehicle which led Kelley to believe it was a switched tag. (Ex 2 at 36:01-38:33; Ex. 10 at 13-15, 17-18). To determine whether the vehicle was properly registered to Plaintiff, Kelley asked Plaintiff if it was his vehicle, to which he responded that it was. *Id*. Kelley then approached the vehicle and observed the VIN number to confirm the match. After Kelley determined that the vehicle was registered to Plaintiff, the officers allowed Plaintiff to get in his vehicle and leave, thus ending their encounter. *Id*.

Plaintiff has admitted that he was not damaged at any point and is only seeking punitive damages from the incident. (Ex. 1 at 136).

### III. <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). Rule 56(c) provides as follows:

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

*(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

Fed. R. Civ. P. Rule 56(c).

Defendants, as the parties seeking summary judgment, bear the "initial responsibility of informing the district court of the basis for [their] motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If Plaintiff, the nonmoving party, fails to make "a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," Defendants are entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  In assessing whether Plaintiff has met his burden, "the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter….Instead, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'"  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998-99 (11th Cir. 1992).

"After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *AGSouth Genetics, LLC v. Cunningham*, No. CA 09-745-C, 2011 WL 1833016, at *2 (S.D. Ala. May 13, 2011). WL 1605561, at *2-3 (S.D. Ala. May 7, 2012).

## IV. <u>Analysis</u>

Based on his complaint, Plaintiff seemingly claims violations of his First and Fourth Amendment rights based on the actions of Defendants. Defendants submit that they did not violate Plaintiff's constitutional rights. In the alternative, Defendants claim that they are entitled to qualified immunity.

"The qualified-immunity doctrine seeks to balance 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). Qualified immunity protects government officials who are sued in their individual capacities if they are "engaged in discretionary functions … unless they violate 'clearly established federal statutory or constitutional rights of which a reasonable person would have known.'" *Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (quoting *Keating v. City of Miami*, 598 F. 3d 753, 762 (11th Cir. 2010)). "Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity." *Snider v. Jefferson State Comm. College,* 344 F.3d 1325, 1328 (11th Cir. 2003) (citing *Malley v. Briggs,* 475 U.S. 335 (1986)). Qualified immunity

is a long-recognized defense that provides "immunity from suit rather than a mere defense to liability[.]" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

To be entitled to qualified immunity, the government official must first show that he was acting within the scope of his discretionary authority when the alleged unconstitutional acts occurred. *Hinson*, 927 F.3d at 1116. "The term 'discretionary authority' covers 'all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority.'" *Id.* (quoting Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994)). Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate." *Id.* To do so, the plaintiff must prove (1) that the government official violated a constitutional right and (2) that the constitutional right was clearly established at the time of the official's actions. *Id.*

## A. **Plaintiff's Fourth Amendment Claim Against Milne**

In his complaint, Plaintiff argues that Milne violated his Fourth Amendment "right to be free from unlawful seizure and search." (Doc. 1 at p. 10). Specifically, Plaintiff asserted that, because he was engaged in a constitutionally protected activity (filming portions of a USCG Base as a YouTube content creator), Milne did not have reasonable suspicion of criminal activity and, therefore, no right to detain or ID him. (*Id.* at p. 9). Plaintiff specifically takes issue with Milne's request for his social security number to identify Plaintiff because Plaintiff claimed that he did not have a driver's license or other written identification. Milne contends that he is entitled to summary judgment on this claim on the following grounds: 1) he did not violate Plaintiff's constitutional rights and 2) he is entitled to qualified immunity.

**1. Discretionary Function**

To prove that a police officer was performing a discretionary function, it must be shown that the officer was "(a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Plaintiff has not disputed Milne's argument that he was performing a discretionary function during his interaction with Plaintiff. It is undisputed that Milne was employed with the MPD on the date of the incident, was in uniform, was dispatched along with Kilburn to respond to two separate emergency calls placed by USCG personnel and interacted with USCG personnel and Plaintiff at the scene as a part of a routine police investigation into Plaintiff's alleged criminal conduct (trespass). Plaintiff's complaint identifies Milne and Kilburn as "officers" upon their arrival at the scene. (*See* Doc. 1). Milne was indisputably "performing a job-related function," by responding to emergency calls regarding potential criminal activity, and investigating same, as a part of his employment as a police officer with MPD. *Hinson*, 927 F.3d at 1116 (holding that defendant police officers satisfied the discretionary function requirement "as they undertook all the challenged actions while on duty as police officers conducting arrest and investigative functions").

Because Milne was performing a discretionary function, the burden shifts to Plaintiff to demonstrate that Milne is not entitled to qualified immunity. To show that Milne is not entitled to qualified immunity, Plaintiff must prove that Milne (1) "committed a constitutional violation **and** (2) that the constitutional right [Milne] violated was 'clearly

established' at the time he did it." *Paullin v. City of Loxley*, 171 F. App'x. 773, 777 (11th Cir. 2006) (emphasis added).

### 2. Violation of Plaintiff's Fourth Amendment Rights

Plaintiff has the burden of proving that Milne committed a constitutional violation. As discussed herein, Plaintiff has failed to do so.[3] The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." However, an individual may be temporarily seized, and "'[s]eizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'" *Brower v. Cty. of Inyo*, 489 U.S. 593, 599 (1989). "Although not expressly authorized in *Terry, United States v. Brignoni-Ponce,* 422 U.S. 873, 881–882 (1975), was unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop." *Fla. v. Royer*, 460 U.S. 491, 498 (1983).

The determination of whether an officer has reasonable suspicion of criminal activity is a question of law. *See Evans v. Stephens*, 407 F.3d 1272, 1280 (11th Cir. 2005). "We consider the totality of the circumstances 'in light of the officer's own experience' and determine 'whether the officer can point to specific and articulable facts which, taken together with rational inferences from those facts' support an 'objectively reasonable suspicion that [Plaintiff] had engaged ... in a crime.'" *Young v. Brady*, 793 F. App'x 905, 909 (11th Cir. 2019) (quoting *United States v. Caraballo,* 595 F.3d 1214, 1222 (11th Cir. 2010)). Moreover, "[w]hen an official asserts qualified immunity for an

---

[3] Plaintiff's *pro se* status does not relieve him of the duty of production and proof in a civil case. *See Brown v. Crawford,* 906 F.2d 667, 670 (11th Cir. 1990).

alleged Fourth Amendment violation, the question is not whether the official had actual reasonable suspicion, but whether the official had 'arguable' reasonable suspicion." *Id.* (citing *Jackson v. Sauls,* 206 F.3d 1156, 1166 (11th Cir. 2000)).

At the time of the incident involving Plaintiff, Milne was investigating several potential criminal issues. According to 18 U.S.C. § 1382, "[w]hoever, within the jurisdiction of the United States, goes upon any military, naval, or Coast Guard reservation, post, fort, arsenal, yard, station, or installation, for any purpose prohibited by law or lawful regulation . . . [s]hall be fined under this title or imprisoned not more than six months, or both." Additionally, 18 U.S.C. § 795 states that "[w]henever, in the interests of national defense, the President defines certain vital military and naval installations or equipment as requiring protection against the general dissemination of information relative thereto, it shall be unlawful to make any photograph, sketch, picture, drawing, map, or graphical representation of such vital military and naval installations or equipment without first obtaining permission of the commanding officer of the military or naval post, camp, or station . . . ."[4] Furthermore, Ala. Code § 13A-7-4 states that a "person is guilty of criminal trespass in the third degree when he knowingly enters or remains unlawfully in or upon premises."

It is undisputed that USCG officers Davis and Bradley separately called for police to investigate potential criminal activity at the entrance to the Base. Davis reported in his call that Plaintiff was filming the Base, that he was on Base property, and that he did not

---

[4] *See* Exec. Order No. 10104; *see also Tharp v. Alutiiq Pac., LLC*, 2018 WL 6628945, at *8 (D. Haw. 2018) ("Defendant also cites to Executive Orders 8381 and 10104 by President Franklin D. Roosevelt and President Harry S. Truman, respectively. Pursuant to Executive Orders 8381 and 10104, former Presidents have designated all federal military and naval installations, among other things, as "vital.").

leave after being requested to do so. Bradley informed MPD through dispatch that Plaintiff was on USCG property, that he was cussing at USCG security personnel, that he was improperly filming while on Base, and that the situation was escalating. Milne testified that, upon arrival at the scene, he observed Plaintiff standing by the Base fence, which was clearly marked as U.S. Government property with "No Trespassing" signs on it. Furthermore, he observed Plaintiff with camera equipment filming onto a federal military installation. In addition to the emergency calls and his own observations, Milne spoke with at least two (and potentially three) USCG personnel before speaking with Plaintiff. (*See* Ex. 2).

Plaintiff contends that the area he was standing on by the entrance to the Base was a public right of way and that Milne should have known this. (Doc. 9). This argument holds no water in relation to whether he was trespassing on military property. In a case that addressed a similar argument, the Sixth Circuit Court of Appeals stated:

> "But the main driveway of Wurtsmith Air Force Base was not built on land owned by the county. The county's right-of-way may have overlapped the driveway and the adjacent island, but a mere right-of-way, as the trial court noted, 'is less than ownership....' The typical Michigan suburbanite owns the portion of his driveway that lies between the sidewalk and the street, even though that portion of the driveway is burdened by a local government's right-of-way. The right-of-way may cover the suburbanite's entire tree lawn, along with such of the driveway as lies within the tree lawn, but the right-of-way is less than ownership in fee, and the driveway belongs to the homeowner. As far as Wurtsmith Air Force Base is concerned, similarly, Judge Churchill said 'there isn't any question that the entire area up to at least the center of the road, if not beyond, is a part of the military base....' As a matter of real estate law, that proposition would seem unassailable."

*United States v. McCoy*, 866 F.2d 826, 831 (6th Cir. 1989).[5] The Court finds that Plaintiff's own conclusion that the area upon which he was standing was a place he had a right to be is not supported by any evidence in the record, especially in light of the *McCoy* decision and the fact that at least three USCG officials contend otherwise.

In addition, the Court finds that Milne's brief investigative seizure, and specifically his request for I.D. and the social security number of Plaintiff, was constitutional as it was limited in duration and scope. "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officers at the time." *Adams v. Williams*, 407 U.S. 143, 146 (1972); *see also United States v. Hensley*, 469 U.S. 221, 229 (1985) ("if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offence, that person may be able to be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information"). It is well-established that "an official may conduct a brief, investigatory stop, otherwise known as a '*Terry* stop,' if he has a reasonable suspicion of criminal activity." *See Jackson,* 206 F.3d at 1165.

Based on the undisputed evidence, the Court concludes that Milne had at least arguable reasonable suspicion (if not actual reasonable suspicion) that Plaintiff was trespassing on a federal military installation and filming same sufficient to justify a request that Plaintiff provide identification. After running Plaintiff's information in at least

---

[5] In *McCoy*, the plaintiff, a protester who was handing out leaflets in the driveway of the main entrance of Wurtsmith Air Force Base, contended that the paved area upon which she was standing on the Base side of a county highway was within the public right of way. 866 F.2d at 827-28.

one law enforcement identification system and being unable to come up with any identifying information, Milne requested more identifying information from Plaintiff, including his social security number. Although Plaintiff admittedly had no ID on him to prove his identity, he argues that he could not be required to provide his social security number for that purpose. The Court finds that Milne's request for Plaintiff's social security number, under the totality of the circumstances, did not constitute an unreasonable search and seizure given Plaintiff's unwillingness to provide identification or other identifying information. Even if the Court had not reached this conclusion, the outcome would be the same, however, because Plaintiff has not shown, and cannot show, that the conduct violates clearly established law to request the social security number of an alleged perpetrator who refuses to produce identification. *See, infra,* at pp. 17-18.

### 3. Violation of Clearly Established Right

Even if this Court found that Milne did violate Plaintiff's Fourth Amendment rights, Milne would still be entitled to qualified immunity because Plaintiff has not proven the second element of the two-prong test; that is, that the right was clearly established in a "particularized sense." *See Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). Based on the undisputed evidence concerning the events at the Base that day, Milne's actions were objectively reasonable under the circumstances, and "an objectively reasonable officer in the same circumstances and possessing the same knowledge as [Milne] could have believed that probable cause existed to [stop and I.D. Metz]." *Paullin*, 171 F. App'x at 777. Given the facts set forth above, Milne had a legitimate interest in stopping Plaintiff to investigate potential trespassing, and his request for identification (including

social security number) to further investigate the situation and Plaintiff's potential criminal history was objectively reasonable under the circumstances. *See United States v. Purcell*, 236 F.3d 1274, 1277-78 (11th Cir. 2001); *see also United States v. Villagrana-Flores*, 467 F.3d 1269, 1277 (10th Cir. 2006).

Plaintiff has cited no law in support of his argument and, in fact, in his response, did not address the issue of whether the allegedly infringed right here was clearly established at all. (Doc. 36). The Court, however, discovered a federal case from the Central District of California that it finds persuasive. In *Williams v. San Bernardino County Sheriffs Department,* Case No. 5:19-cv-00470-SVW-SHK, 2020 WL 5078812, at *3 (C.D. Cal. June 23, 2020), the plaintiff claimed that the officer defendant was not entitled to qualified immunity because *Schwier v. Cox,* 340 F.3d 1284, 1289 (11th Cir. 2003), "demonstrate[d] that '[t]he law was clearly established that an officer [who requested a social security number during an investigatory stop] could not elevate a detention to a de facto arrest – or even deny a person "any benefit" – because the individual refused to disclose his social security number.'" The court there rejected the plaintiff's argument, holding that "[t]he *Schwier* case concerned voting rights and has no clear application to Plaintiff's situation." *Id*. The court concluded that the officer was entitled to qualified immunity ***"because it does not violate clearly established law to detain a suspect who refuses to provide his Social Security number …."*** *Id.* (emphasis added). This Court likewise concludes that Milne's request for Plaintiff to provide his social security number under the circumstances in this case did not violate clearly established law.

Based on the foregoing, Milne is entitled qualified immunity and, accordingly, to summary judgment in his favor.

## B. **Plaintiff's First Amendment Claim Against Kelley**

Plaintiff has alleged a claim against Sgt. Kelley for violation of his First Amendment rights.  Like Milne, Sgt. Kelley contends that Plaintiff's claims against him are due to be dismissed on the grounds that Plaintiff's First Amendment rights were not violated and because Sgt. Kelley is entitled to qualified immunity.

### 1. Discretionary Function

As with Milne, Plaintiff has not disputed that Sgt. Kelley was performing a discretionary function at the time of his encounter with Plaintiff. Sgt. Kelley was a Sergeant with the MPD on the date of the incident and was a responding supervisor, called to the scene at the request of Plaintiff in his role as a supervisory officer. (*See* Ex. 2; Ex. 10 at 5). Given the fact Sgt. Kelley arrived at the scene to assist in the investigation, and arrived at the behest of Metz, the Court finds that he was performing a discretionary function at the time of this incident.

### 2. Violation of Plaintiff's First Amendment Rights

Plaintiff seemingly argues in his complaint that Kelley violated his First Amendment "right to free press on public property" when Kelley "kicked [him] off public property under threat of arrest" and asked Plaintiff to move across the street from the Base to film. However, Plaintiff's First Amendment rights were not violated because Kelley's request for Plaintiff to move across the street—to an area that was not USCG property—was a content-neutral restriction on speech in a public forum that was reasonable in time, place, and manner.

To determine whether First Amendment rights have been violated, the Supreme Court has espoused a three-pronged analysis: ask first whether the speech is "protected by the First Amendment;" second, determine "the nature of the forum;" and third, ask whether the government's "justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc.,* 473 U.S. 788, 797 (1985). The 11th Circuit has held that "'[t]he First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest.' ... In particular, we held that the plaintiffs there 'had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct.'" *Crocker v. Beatty*, 995 F.3d 1232, 1240 (11th Cir. 2021) (quoting *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000)) (citation omitted).

However, "it is decidedly *not* 'obvious' that *Smith*'s 'general rule applies to the specific situation in question' here." *Crocker*, 995 F.3d at 1240–41 (quoting *Youmans v. Gagnon,* 626 F.3d 557, 563(11th Cir. 2010)) (emphasis in original). The Court need not determine whether Plaintiff had any First Amendment right at all to film onto the USCG base or, indeed, whether Plaintiff was trespassing to determine whether his First Amendment rights were violated by Kelley. As discussed *supra*, according to three USCG officers, Plaintiff was trespassing on federal military property in violation of both federal and state law. The reports of these USCG officials were sufficient to provide Kelley the right to investigate. In *United States v. Rubio, as modified,* 727 F.2d 786, 791 (9th Cir. 1984), the Court of Appeals stated that it strongly disagree[d] with any inference that criminal investigation is somehow prohibited when it interferes with ...

20

First Amendment interests. When activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play."

Even assuming Plaintiff's filming of the USCG facility and related personnel was a protected activity under the First Amendment and that he was standing in on a public right of way,[6] Sgt. Kelley did not violate his First Amendment rights by asking him to move across the street. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981) (citations omitted). All activities protected by the First Amendment are subject to reasonable time, place, and manner restrictions. *Id.* (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972)). "We have often approved restrictions of that kind [time, place and manner] provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 (1976).  Each of these requirements were satisfied by Milne and Sgt. Kelley.

First, Sgt. Kelley's demand for Plaintiff to relocate and continue his activity across the street was content neutral. In fact, Defendants never asked Plaintiff what he was

---

[6] The Court notes that even if Plaintiff was in a public right of way when he was filming the Base at the time he was asked to relocate, he was still also on federal property which the USCG had the right to control and, by extension, to limit his First Amendment rights.

doing, what the subject of his filming was, what the purpose of his filming was, or any other question that would shed light on the content of Plaintiff's First Amendment activity. (*See* Ex. 2). Defendants' issue with Plaintiff was not his activity, but his location - specifically that he was reportedly on the USCG facility without permission and trespassing onto federal, non-public property. Sgt. Kelley's "regulation" of Plaintiff's "speech" was clearly content neutral.

Second, Sgt. Kelley's demand for Plaintiff to move across the street served a significant governmental interest in keeping Plaintiff from disrupting the flow of vehicular traffic going into the Base and allowing USCG security guards to focus on their duties. Plaintiff was standing directly next to the driveway leading to the guardhouse at the entryway of the USCG facility. Plaintiff's presence in close proximity to the entrance to the Base caused USCG security guards to divert attention to him rather than focus on the vehicles approaching the guardhouse. In this way, Plaintiff was interfering with USCG security guards' performance of their duties. Relocating Plaintiff across the street relieved the issues posed to the flow of traffic and permitted USCG security guards to focus on their duties, both of which are significant governmental interests. *See United States v. Corrigan*, 144 F.3d 763, 768 (11th Cir. 1998) ("'[M]ilitary officials need not demonstrate actual harm before implementing a regulation restricting speech,' and may act to forestall reasonably anticipated harm to morale or to the orderly functioning of the base." (quoting *Ethredge v. Hail,* 56 F.3d 1324, 1328 (11th Cir. 1995)).

Finally, Sgt. Kelley's restrictions were narrowly tailored to serve these substantial governmental interests. Plaintiff was not prohibited from speaking or filming at any time. He was merely asked to move approximately 30 feet away, just across the

street, where he was permitted to continue speaking and filming. Plaintiff was still able to reach his intended audience from across the street.

Based on the foregoing, the Court finds that Kelley's actions in requesting Plaintiff to relocate were content neutral and narrowly tailored in time, place, and manner. Accordingly, the Court concludes that Kelley did not violate Plaintiff's First Amendment rights.

### 3. Violation of a Clearly Established Right

Even if the Court were to find that Kelley's actions violated Plaintiff's First Amendment rights, he has not proven*, nor attempted to prove* the second element of the two-prong test. Although Plaintiff may have a right to film the activities of public officials in a public area, as noted above, there is no evidence that Plaintiff's right to film onto the USCG Base while standing on federal property in close proximity to the entrance to the Base was clearly established in a "particularized sense." *See Brousseau,* 543 U.S. at 199. The question of "whether the violative nature of particular conduct is clearly established," must be answered "in light of the specific context of the case, not as a broad general proposition." *Crocker,* 995 F.3d at 1241. In *Crocker*, the plaintiff brought a § 1983 action against an officer for violation of his First Amendment rights as he was filming police activity while "spectating on the median of a major highway at [a] rapidly evolving scene of a fatal crash." *Id.* at 1241. The Eleventh Circuit stated that, "in that 'specific situation,' we don't think it would be obvious to every reasonable officer that *Smith* gave [Plaintiff] the right to take pictures of the accident's aftermath." *Id.*

23

In this case, Plaintiff's right to film onto the Base while on Base property (whether public right of way or not) has not been clearly established. As discussed above, it is well-established that First Amendment activities can be limited on military installations. Moreover, Plaintiff has not presented any evidence that he had permission, or any other right, to violate the bounds of federal property to video USCG personnel or the Base in general. Kelley was responding to an evolving investigation into potential criminal activity involving Plaintiff trespassing and filming onto a military installation. Given the information available, through his own observations, the observations of Milne and Kilburn, and the information provided to him from emergency dispatch and the USCG personnel at the scene, it is not "obvious" that "every reasonable officer" would determine that Plaintiff had the right to conduct the alleged First Amendment activity in that location and manner.

Based on the foregoing, the Court concludes that Plaintiff's First Amendment claim against Kelley, who was acting within his discretionary function as an MPD officer, fails because Kelley is entitled to qualified immunity. Summary judgment in Kelley's favor is, therefore, proper on Plaintiff's First Amendment claim against him.

## V. <u>Conclusion</u>

For the reasons stated herein, it is **ORDERED** that the Motion for Summary Judgment (Doc. 31) filed by Defendants Clarence Milne and Sergeant Michael Kelley is hereby **GRANTED.**

A Final Judgment consistent with the terms of this Order shall be entered by

separate document as required by Rule 58 of the *Federal Rules of Civil Procedure.*

     **DONE** and **ORDERED** this **8th** day of **August, 2023**.

                    <u>/s/ P. Bradley Murray</u>
                    **UNITED STATES MAGISTRATE JUDGE**